314-0543 Consolidated with 314-0795 and 316-0133 Angela McIntyre, Administrator of the Estate of Dan Donald McIntyre, deceased. Appellant by James Carter v. Sacha Thomas, MD and Oncology-Hematology Associates of Central Illinois. Counselor, you may proceed. Dr. Thomas was originally a respondent in Discovery. Dr. Thomas was not the original, quote, target of the case. In fact, he was a respondent in Discovery who was then dismissed. And by plaintiff's third amended complaint, which I've pointed out at pages 12 and 13 of our brief, initial brief, was added in the third amended complaint as a defendant. The plaintiff's complaint asserted that Dr. Thomas was a hematology consultant on call to OSF Hospital. That evening was not a random call, not a chance call, not something that occurred accidentally. He was the on-call hematologist. He was taking call for his group. It was his responsibility to take call, and his responsibility couldn't refuse that, and it was his responsibility to exercise his judgment and attend to a patient if his advice was sought. In this case, he was called because there was a hematology issue involving a patient, Mr. McIntyre, who was being admitted to the medical intensive care unit. We alleged he had a duty to participate in the care. He had to exercise his judgment, and we never alleged that he gave the advice to stop giving the blood. That was never an allegation against him. Our allegation against him was that he had a duty, in conjunction with the medical intensive care unit physicians, to assist in providing the highest level of medical care that Dr. Miller attested to in his deposition, which was part of the record before Judge Dubicki. Now, Judge Dubicki undertook to evaluate the case, and his order expressly indicated that this was a single phone call. I believe his order indicated that it was almost a policy ruling that a single phone call is not going to create a duty on the part of a physician. And with all respect to Judge Dubicki, his order never even mentions any of the undisputed evidence that we put before the court in addressing the issue of duty that was raised by the motion for summary judgment. By that I mean the 206-A-1-2 deposition of Dr. Miller, who was then vice president and chief medical officer of OSF, as well as Dr. Vietor, 206-A-1 deposition of, and he was at that time the chief officer of oncology, hematology, the employee group of Dr. Thomas. Both of those men repeatedly said, or said essentially the same thing. It wasn't, it's not an informal process. On call for the group was to fulfill their contractual obligations. Dr. Thomas agreed to fulfill those obligations when he was privileged by the hospital. Dr. Miller reiterated that you can't choose not to take call. It's not a voluntary undertaking. This was a formalized process, much like this court addressed in the Mackey decision. This wasn't, he was on call. He was the person that was called by Dr. Bolton because he was the on-call hematologist. And both those people, 206-A deponents, indicated clearly that this wasn't something he could refuse to take. His obligation was then to make an assessment as the on-call physician about what needed to be done. He chose not to go to the hospital. Our allegation against him in the complaint was that he had an obligation to come to the hospital. He had an obligation to help advocate for the patient. Perhaps if he had been there when Dr. Balagany entered in order not to give any more blood, we wouldn't be here today. Again, this wasn't like curbside, informal, off-the-cuff solicitation of medical advice. It was specifically because of the on-call system. The defendant argued to the trial court that there was no duty. They reiterate that here because, A, Dr. Thomas did not physically see the patient. That was his decision, his decision. He knew it was a hematology issue, and it was his decision that he didn't need to go to the hospital. That's in his deposition. I think I read part of that earlier this morning, which he indicated he assumed they were continuing to give the treatment that he thought that he was told they were giving when, in fact, they weren't. He did not order treatment. He gave the advice that they should continue to give the treatment, but he wasn't there to order treatment. He chose not to go to the hospital and participate. And they also said he didn't have a duty because he did not bill for his services. His group was paid by the hospital to provide on-call service. He was appearing on behalf of the group. He's paid by the group. And I think that was covered in the 206A deposition of both Drs. Miller and Dr. Veeder. Balagany, Dr. Balagany testified that he was part of a team of physicians. He anticipated or thought that the consultant had a duty to come. Dr. Balagany's deposition was part of the record before the trial court. Furthermore, Dr. Abrams, who was Plaintiff's expert, a hematologist from Penn University, testified that he believed that the standard of care for Dr. Thomas under the circumstances, given the relationship between the hospital and the group and the on-call system, was he was obligated to come to the hospital to oversee treatment, to advocate for the patient. The trial court, I believe, or the defense says, again, that he was not asked to see the patient. His job, his duty, we allege, was he had to make the judgment. What was the right thing to do? Under these circumstances, he exercised poor judgment. He breached his duty. They said, well, McIntyre never requested him. Well, Mr. McIntyre never requested anybody. He came to the hospital in an emergency situation and then was admitted to the MECU because he needed the highest level of patient care. The trial court's order says, quote, A single phone call does not result in a physician-patient relationship. And that, of course, I think was referencing to the Reynolds decision. This isn't about a single phone call. With all respect to Judge DeBakey, the trial court ignored all the other evidence. He didn't mention it in his order. It wasn't a single phone call that creates the duty. It's because he got the call because he was on call verbally to provide hematological services. He got the call not just from any physician. He got the call from the physicians in the medical intensive care unit because they had a patient that had a hematological problem. His duty was to act on that. The law, it says that a matter of duty is something to be determined by the court, and I agree with that. There are circumstances where judges have to consider evidentiary facts to help them come to a conclusion as to what the duty is. With all respect, judges don't know the particular formalities of the medical complex in the process that's at issue. The only way the court can be informed of that is to be given information about what the process is requiring. In this case, we gave that to the court. The court below just ignored that evidence entirely. This was a formal process. This was not informal in any fashion. The other side is arguing that you're judicially estopped from raising any of this because I went to trial. Well, Your Honor, with all respect, I don't know how that argument can be made where the issue before this court on this case, in this particular instance, deals with the granting of a summary judgment. The subsequent events of trial weren't before the trial court. And on top of that, even if the court could take judicial notice of that process, which I suspect the court can, the allegations of negligence against Dr. Balaghani and Dr. Bolton in OSF are not exclusive, mutually exclusive of allegations that may be raised against Dr. Thomas. Dr. Thomas, Brockman Claus talks about, may be more than one cause. And in this case, if he was part of the team of physicians that was put together to help patients in the medical intensive care unit, it's foreseeable that he's going to get a call about a patient that has a hematologic emergency. And I think what their argument is that since we went to trial and got a verdict that we're now estopped, all I said at the trial was, and I put this in our brief, I believe, we said, I always advocated to the trial court, and I think you heard me earlier this morning, never, never, never did we say that Dr. Thomas ordered the blood to be stopped. Never. That was Dr. Bolton, or Balaghani's decision, according to Dr. Bolton who wrote it in the record. We're saying that Dr. Thomas had the obligation to come because it was a hematological problem, come, assess the patient better, and monitor the process that was going on, make sure he was getting the right form of treatment. And that was his duty. That was his duty because he was on call as a hematological specialist for that very purpose. He had to exercise his judgment at that time about what to do. And he chose just to say, okay, I think you're doing all right, and not monitor the patient. So your allegation is the medical negligence you allege about Dr. Thomas is different than what you brought to me? Yes, sir. If you look at our complaint, it's clear. We're saying that he didn't come to the hospital to help assist. He didn't come to the hospital and advocate for the patient. We never once said he was negligent because he ordered blood to be stopped because that was never in the record. In fact, Dr. Bolton wrote in the record that they were to give IgE and steroids. There was nothing she wrote in the record. That was one of the problems we had at trial. There was nothing she wrote in the record that said Dr. Thomas told us not to give blood. That appears nowhere in any medical record. So hypothetically, if you were to be successful in this appeal, what does that do to the other parties? Well, it sure would have been easier to try the case if Dr. Thomas had been a partner. Now, going forward, the argument is that it's moot because we've obtained a judgment. But it's not moot.  I don't know what the court is going to do with the case that went to trial. Even if the court affirms the outcome in the trial court, until a defendant satisfies any judgment, the case is not concluded. They could take a further appeal. Perhaps the Supreme Court would take the case. Perhaps the Supreme Court would reverse it. So what I'm saying to this court today on this issue is this isn't an advisory opinion. It was a decision made in the trial court. The defendants that were before you earlier today, you could tell the whole argument below a trial was, oh, gee, Dr. Thomas isn't here. He's responsible. So if this court would conclude that the case should go back for trial, then certainly it would be appropriate that Dr. Thomas would be part of that if the court agrees with my appeal today. So I don't think it's an advisory. I think the issue still potentially could come into play. Did I answer your question? Who would be the parties on remand if hypothetically this appeal was granted? And if you reverse the judgment and it all goes back for trial, if that's the case, if just this case, well, on remand it would just be Dr. Thomas until such time as the other case is concluded. And obviously in the event that the case is successful from my client's point of view on appeal and the judgment is satisfied, then the case would be concluded because even if Dr. Thomas was negligent, the amount of the verdict is going to establish what the injury was. So you couldn't take him to trial and ask for more money, damages. I understand the court's concern that this is perhaps, I'm going to say advisory again, but as it sits procedurally, I think technically the matter is still ripe for adjudication. Any more questions, Your Honor? Okay. I would just say that then briefly, several cases they cite which found duty, that the trial court cited Silva and the trial court orders that Dr. Cox contact with the plaintiff in that case was greater than the contact by Dr. Thomas with McIntyre, thus there was no duty. But as I said, Mr. McIntyre came to the emergency room and then was admitted to the MECU. How would he have called and had a communication with Dr. Thomas? That really isn't relevant to the inquiry based on the facts before this court. Thank you. Counsel, you may proceed. Thank you, Mr. Court. Counsel, just as my name is Krista Frick and I represent Dr. Thomas and his Corporation of Oncology and Hematology Associates, which he is an employee. There's a lot to answer, a lot to respond to as to what the plaintiff's counsel was saying. I think it's most appropriate, though, to begin with the issue that this is moot. We heard Mr. Carter speak to this panel this morning during the 9 o'clock argument where he made very clear that his expert, Dr. Abrams, testified Dr. Thomas is not at fault. Mr. Carter made very clear that he never argued to the jury that Dr. Thomas was at fault. In fact, he argued the opposite, that Dr. Thomas had no involvement when it came to the timing of the blood, the timing of the steroids, the IVIG. Now, was he going to the treatment or was he going to the duty of care to observe the patient, visit the patient, and perhaps countermind a bad decision or support a proper decision? It can go either way by the physicians in attendance in that ICU unit. Sure. When plaintiff stated that his third amended complaint did not allege anything regarding the blood and the timing, on page 12 of plaintiff's brief, he makes very clear the third amended complaint alleged medical negligence in the failure in timely and adequately providing recognized blood, steroids, and IVIG to the recognized anemia diagnosis directly resulting in the death of Dr. McIntyre. The third amended complaint reflected counts against OSF, Bolton, Balaghani, his corporate employer, and added counts naming the Thomas defendant. Well, as I understand the case, and you can correct me, is that this Dr. Abrams, is that right? Correct. That was plaintiff's expert at trial. Okay. Was it addressing which deposition of Dr. Thomas? Because they were conflicting, were they not? No. In fact, plaintiff's counsel made very clear that they were not conflicting. The reason for two depositions in this case, as counsel explained, was that Dr. Thomas was initially a respondent in discovery. So the first deposition was far more limited to deciding whether or not he belonged to this case. Well, let's just talk about what Dr. Thomas said. Sure. So Dr. Thomas made clear, as plaintiff's counsel represented to this court, that he never told him to stop the blood transfusions, never told him to stop giving blood. In fact, as Mr. Carter argued to this court... That's in which deposition? That was in the second. What about the first? The first deposition, he never said that he ordered to stop blood. What they were speaking about in the first deposition was whether or not there would be a concern for a reaction to the use of O-negative blood. And therein, Dr. Thomas said, likely not, not in this day and age, because it is so carefully screened. But is that a concern to consider? Sure it is. But nowhere in that first deposition did he say he ordered blood to be stopped. Mr. Carter made that clear today, both to you, he made it clear to the jury. And Dr. Abrams gave an opinion to a reasonable degree of medical certainty at the time of trial, that Dr. Thomas was not at fault. And as this court can take judicial notice of, fault in the framework... Was not at fault. What was the scope of his statement that he was not at fault? Was it as to cessation or continuation of transfusions? In... Sure, in relation to what he was speaking, but he did say not at fault. Plaintiff wanted to use Dr. Abrams, certainly, to say that Dr. Thomas was the sole proximal cause. Indeed, if there was some other causation by Dr. Abrams, that his not coming to the hospital was a deviation from the standard of care, the Balgani defendants certainly would have used that. But even if we go back, if the duty was that he needed to come... Well, did we hear what they would have used? I mean, they certainly would have used... I mean, that helps support, but that isn't really what we're focusing on, is it? Well, I think to the extent that both Mr. Carter and Dr. Abrams made clear that Dr. Balgani, they did not fault Dr., I'm sorry, they did not fault Dr. Thomas. And now Mr. Carter is here today stating that his duty was to come to the hospital, but not... But I mentioned a different kind of medical negligence against Dr. Thomas. A different kind of medical negligence, right? Given the position that the... and the contractual relationship that Dr. had with the hospital. Sure, so that's... A particular specific kind of specialty expert. Right. Well, that was... That's the kind of negligence they're arguing against Thomas. Well, the negligence they were arguing against Thomas was certainly, it was medical negligence, him as a hematologist. By the time this got to trial, Dr. Thomas had testified that he received a call from Dr. Bolton, that Dr. Bolton told him, here's what we're doing, we're giving blood, we're giving steroids, we're giving IVIG, which was textbook treatment for this type of diagnosis. And Dr. Bolton said, well, I have a concern maybe about steroids, given a suspected infection. And the only thing added, and this is clear in the records written by Dr. Bolton, was that Dr. Thomas suggested maybe get an ID consultant on board just to consider that issue. But we've already deemed that he's not at fault. So there's no standard of care, and we'll get to the standard of care violation, on his care and treatment of this patient when he was called. There is no proximate cause. Dr. Abrams made that very clear, that he was not faulting Dr. Thomas for anything to do with the treatment that was actually provided. The issue of duty becomes the issue. What was the contractual obligation of your client vis-a-vis these kinds of cases? What was expected from your client based on their contractual obligations, based on their specialty? The contract that Mr. Carter is speaking about, those contractual obligations, were between Dr. Thomas' employer and the hospital. So any duty that Dr. Thomas had was to his employer, arguing if he wanted to go further, or to the hospital. What could be done if he breached that contractual duty? Well, he could lose privileges, or he could be fired from his position. But the existence of a contract between a hospital and a hematology group, or any other type of group, does not in any way establish the existence of a duty between the physician and the patient. Indeed, if that were true, every physician's group that had any type of agreements with the hospital for purposes of privileges, the second they answered the phone on a call would be deemed to have created that physician-patient. So you're suggesting to this court that if doctors with specialties have these contractual relationships to be on retainer for these kinds of particular problems that might or may come up in the hospital, on the emergency room, and so forth, there's no medical negligence claims that can be brought against them? They don't have any obligation to do anything? They just have a contractual obligation that maybe their employer can sue them, or the hospital can say he breached the contract? But the fact that they failed to give advice, hypothetically, that they should have been given, that doesn't matter? No, certainly not. That's not what I'm saying. And that's why even in Justice Holdren's decision that came about two years later in Mackey, what's the appropriate decision? The court didn't look at one factor. The court looked at a multitude of factors and looked at not just that a physician was on call. And we know from today and the trial that Mr. Carter is not alleging that Dr. Thomas did not take the call. He's not alleging that Dr. Thomas did not give advice. He's not even alleging that Dr. Thomas gave the wrong advice. We know from Dr. Balgani's testimony that he wasn't even required to follow Dr. Thomas' advice. Is he suggesting that Dr. Thomas didn't do enough? I think today in front of this court he's asserting that Dr. Thomas didn't do enough because he didn't come to the hospital and speculatively that maybe if he came he could have prevented the negligence of somebody else. And that's a very different allegation that he was the fourth in his initial in the third amended complaint. It did not go that far to... Of course that's why he went into contracts with specialists so they can help the non-specialists not make a mistake and do the right thing. And that's what was done here. When Dr. Thomas was contacted and you heard from the Balgani defendants and from Mr. Carter that the treatment to be offered was the blood, the steroids and the IVIG. They contacted Dr. Thomas. They already had a diagnosis. The diagnosis had already been made almost two hours before they called Dr. Thomas. They had already started the treatment. The treatment was underway. When they called Dr. Thomas he said, yep, that treatment looks good. He was never asked to come to the hospital. And I don't suggest by Mr. McIntyre. There are cases where the consultant is contacted and they're asked, we need you to come right away. He was never asked to come to the hospital. And that's undisputed. He did say, if you need me tomorrow, I can come see the patient. He was called about two hours after the patient passed away, early that morning. It was about 3.45 in the morning, I believe, and told the patient has passed away. So it wasn't as though they said, we need you here in the next two hours. There's no evidence that had he gone to the hospital, that anything would have changed. What plaintiff is attempting to do is to state that this contractual duty he could have had, that he had with the hospital or with his employer, creates a patient-physician relationship and a duty to the individual patient. I submit that that's not the case. That's not what Illinois law says. And even if it were, there was no question, based on what Mr. Carter told this court today, he took the call, he spoke to the physician, and there was nothing more to be done. Nothing more was asked of him. He was not asked to make a diagnosis. He was not asked to make any other treatment considerations because, indeed, the treatment that was being given was appropriate at the time. I think when plaintiff is speaking about, well, he could go back to trial on this. You know, we often say plaintiffs don't get two bites of the apple. I think in this case, not only is Mr. Carter asking for two bites of an apple, he's actually asking for two apples. If he were to go back to trial, if this court were to affirm the verdict in his favor, certainly that would be absolute judicial estoppel.  In fact, Dr. Abrams, who's already testified, who already has his opinions, I don't fault Dr. Thomas, and plaintiff's own statements during the trial, he would now have to go back and say, well, this was Dr. Thomas. In fact, it was Dr. Thomas who failed to commit. Okay, what would he have done? There was no testimony to that point because the treatment was always established to be the correct treatment. What the issue was against the Balgani defendants and everyone was that it was not timely given. So absolutely it would be judicial estoppel at that point. It's a single satisfaction. I think the speculation as to that he could go back because the Balgani defendants may go to the Supreme Court, I don't think that that's relevant here, and it certainly isn't relevant to the issue of duty that's before this court. At this point, the issue of duty, I believe, is moot, and if we move further it would be under judicial estoppel. I would just point out, too, I know that plaintiff does rely on the Mackey case that came out about two years later, and really a review of that case is easy to distinguish from the facts that we have here, although there is the common denominator that there was a contractual agreement and he was on call. In Mackey it was an ED physician who called the urologist. An ED physician cannot admit a patient. His only options were to have the urologist admit him or to send the patient home. The urologist in Mackey not only became a team player, he actually got rid of the rest of the team and said, I'm in charge. He instructed him to discharge the patient. He instructed him to not provide any antibiotics. And then he further instructed him to, I'll take care of the patient. Have him follow up with me at a later time. And then the patient did pass away. The urologist in Mackey was far more than a consultant. He acted almost as the attending physician, made all of the decisions, and denied the patient treatment. He was paid for his services. I know Mr. Carter says that Dr. Thomas is compensated through his practice. The fact of the matter is there is no bill that was ever sent to the patient for this consult. And that is highly relevant. The other highly distinguishable facts in Mackey. Dr. Thomas did not conduct any tests, did not receive and review any tests. One of the things, Justice Holridge, you found in the Mackey case was that it was the urologist who was, quote, actually responsible for the patient's care and treatment. It has been unrefuted in this case that the physician who was actually responsible and could take or leave anything that the consultant says was Dr. Balgamy. So Dr. Thomas did not play the same role. Your ruling in Mackey did not disturb Reynolds or Kunder. In fact, it cited to both of those cases as appropriate law that was followed at the time. And unlike the urologist in Mackey, Dr. Thomas was never looked to to make a determination of whether this patient actually received treatment. As in Mackey, whether this patient be admitted, whether this patient receive care and treatment. He was contacted to say, here's the diagnosis we've made, here is the treatment plan we've put together and is in place and in the process at the moment. And he said, that's the right treatment. I can come see you tomorrow if you'd like. Unless the Court has any other questions, I would defer to our brief. Thank you, Counsel. Thank you. Counsel. I thank the Court. At page 30 of our brief, I discuss what Dr. Miller informed us of in the record. And I'd like to just refer to that for a moment. Dr. Miller stated in deposition as the 206A1 deponent of OSF, Dr. Thomas B. Uncall did not have the right to refuse the call. Each one of these are cited to the record. I'm not going to read the cites. Hemolytic anemia is a hematologic disorder. Patients are evaluated in the emergency department and if acutely ill, admitted to an intensive care unit where they can and are expected to receive the highest level of medical care available. Rules and bylaws of the hospital formally embody the Uncall obligation. There was nothing random and formal about the call to Dr. Thomas. A physician who is obligated to provide Uncall services is obligated to assist in providing patient care if he or she is called upon to do so. And it is a matter of the exercise of the Uncall specialist's medical judgment to determine what level of involvement that he or she is required to take for any particular patient that is being inquired of while they are taking call. That's direct quotes from Dr. Miller's deposition informing us of the relationship that was embodied in the assistant. It wasn't just the contractual obligation of oncology, hematology, the employer. It was also, as Dr. Miller testified to, the granting of privileges also from the hospital to the doctor, further imposed obligations tied in with the Uncall process that I just articulated. I respectfully disagree. I don't believe Dr. Abrams came out and expressly said, he said, I don't, I initially was not aware of the second deposition. When I read that, I no longer had criticism of Dr. Thomas. I'm trying to remember that. And at that point, defense counsel was unable to, he was taken aback because he thought for sure he could get into getting Dr. Abrams to point the finger at Dr. Thomas. Again, I will say to this honorable court, it's not a linear, this isn't either or. It's not Dr. Thomas or Dr. Bolton and or Dr. Balaghani. They all participated in some fashion in the process, and or didn't participate as they should have, and that's what we allege, and that the fact that Dr. Thomas chose not to participate really doesn't affect plaintiff's case against Dr. Balaghani, and the hospital where he was making decisions about stopping treatment, and he admitted in the record he didn't even know how to, he didn't know hemolytic anemia. He was unaware of how to treat it when he was taking care of Mr. McIntyre. That's in the record, and so that's where the difference is. Our case with the trial was for those people who we asserted did not even know what to do, and the defense posted all these other possible causes of his death, even including a pathologist to come in and refute the autopsy. The death certificate that was signed by Dr. Balaghani in this case said, Mr. McIntyre died due to or as a consequence of heart failure, due to or as a consequence of shock. The body went into shock. Why? Due to or as a consequence of hemolytic anemia. That's in the record. That's the death certificate. He died because his heart stopped. This is what I showed you earlier on the chart. His hemoglobin got so low there was not enough oxygen to let his body live. It went into shock. His heart died. That's different than saying you have a duty. Donnelly tells us that you can look at these agreements and documents, bylaws, rules, regulations, of the hospital to help you know if there's a duty. And if there is, they can be used as evidence of that duty. And that's all we're saying in this case is that we've shown, we put into the record, the evidence that there was a duty. And his duty was to make a decision and come attend to that hematologic issue in the fashion that his judgment drove him to. And that's where his failure was. So you're saying his failure was given the last, from whom, whether these were hospital protocols or whatever, he had his level of involvement in the particular case. He was part of the team. So you're saying that you're going after whether it was that level of involvement actually was breached or imposed a duty, first of all, or whether there was a breach based on that level of involvement. As Dr. Miller said, it's a matter of the exercise of the on-call specialist medical judgment to determine what level of involvement that he is required to take for any particular patient that he's being inquired of while he's on call. So when you're talking about coming down to the hospital, you're going to that proper or alleged improper level of involvement with back-to-back? Yes. In other words, I'm saying he violated his duty when he chose not to come to the hospital where a patient had a hematologic emergency and put his eyes on the patient and advocate. That's what people in medicine are supposed to do. Nurses, other doctors advocate for the patient, their safety, their well-being, and especially when you consider this was in a medical intensive care unit, which by Dr. Miller's own statement, Dr. DuBois Blanc, the defense expert, repeated it. He would expect, and Dr. Albertson, playing his critical care doctor at trial, said you would expect to have the highest level of medical care in the MICU. So he knew he was getting a call from the MICU. We have a hematologic problem. We never asserted that he ordered the blood stopped. I thank the court. I thank both counsels for their arguments. We'll take a recess for a panel change, and the court will take this matter under advisement.